THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CLARENCE A. LEGG and Another, Appellants, Impleaded with HARTLEY L. ANDERSON, Defendant.

First Department, January 29, 1932.

*Robert H. Elder* of counsel [*Otho S. Bowling* with him on the brief; *Robert H. Elder*, attorney], for the appellants.

*John C. McDermott, Deputy Assistant District Attorney*, of counsel [*Thomas C. T. Crain, District Attorney*], for the respondent.

TOWNLEY, J. Defendant appellants were convicted in the Court of Special Sessions, New York county, for violation of section 60 of the Insurance Law, as amended by chapter 439 of the Laws of 1923. The information charged that the defendants unlawfully issued a statement misrepresenting the terms of two insurance policies and made an incomplete comparison of the policies for the purpose of inducing the insured to surrender his insurance policies. Two questions are raised by this appeal: (1) Whether under the law, as amended, the acts of the defendants Legg and Stapler constituted a crime, and (2) whether, assuming that a crime was charged, there was evidence sufficient to warrant the conviction.

Section 60 of the Insurance Law reads as follows: " Estimates and misrepresentations prohibited. No life, health or casualty insurance corporation, including corporations operating on the co-operative or assessment plan, *mutual insurance companies, and fraternal benefit societies operating on the subordinate lodge system*, doing business in this State and no officer, director, *representative*, or agent therefor *or thereof* or any other person, copartnership or corporation shall issue or circulate, or cause or permit to be issued or circulated, any illustration, circular or statement of any sort misrepresenting the terms of any policy issued by any such corporation, *or any certificate of membership issued by any such society*, or the benefits or advantages promised thereby, or any misleading estimate of the dividends or share of surplus to be received thereon, or shall use any name or title of any policy or class of policies, *or certificate of membership or class of such certificate*, misrepresenting the true nature thereof. Nor shall any such corporation *or society, or officer, director, representative* or agent thereof or any person, copartnership or corporation make any misleading representation or incomplete comparison of policies *or certificates of membership* to any person insured in any such corporation, *or to any member of any such society*, for the purpose of inducing or tending to induce such person *or member* to lapse, forfeit, or surrender his said insurance or *membership in any such society*. The Superintendent of Insurance may in his discretion revoke the certificate of authority issued to any corporation, *society* or agent on his being satisfied that such corporation, *society* or agent has violated any of the provisions of this section."

The italicized words were added by the amendment of 1923. At the time of the amendment the following sentence was stricken

out: "Any violation of this section shall constitute a misdemeanor. and it shall be the duty of the Superintendent of Insurance to revoke the certificate of authority of the corporation or agent on a conviction for so offending."

Section 53 of the Insurance Law now and at the time of the 1923 amendment to section 60 read as follows: "Any corporation or person violating any provisions of this chapter, except where such violation constitutes a felony, shall, in addition to any penalty otherwise prescribed for such violation, be guilty of a misdemeanor."

The question is whether the Legislature by the amendment of 1923 intended to repeal that part of the law which makes a violation of this section a misdemeanor, or whether those words were stricken out as superfluous in view of the general provisions contained in section 53 of the Insurance Law. Section 53 was a part of the original Insurance Law passed in 1892. The penalty prescribed was a fine of $500. In the general revision of 1906, section 53 was amended to its present form and section 60 was added to the Insurance Law. Section 53 in general terms provided that a violation of *any* of the provisions of the Insurance Law should constitute a misdemeanor, and section 60 also contained a provision that a violation of *its* provisions should constitute a misdemeanor. There was, therefore, from 1906 down to the amendment of 1923, a duplication of the provisions declaring the penalty which attached to a violation of section 60.

At the time of the 1923 amendment, it will be seen the general purpose of the amendment was to make the provisions of section 60 applicable to mutual benefit societies and to fraternal societies having insurance features connected with membership therein. The Legislature intended by this amendment to broaden the scope of the protection afforded by section 60. In dropping its penal provision, it cannot reasonably be said to have been the intention of the Legislature to limit the punishment for its violation to the possibility of discipline by the Superintendent of Insurance. The prohibition contained in the section is not confined to those who are subject to control of the Superintendent of Insurance. The construction contended for by defendants would leave no penalty for violations by any persons other than those directly connected with insurance companies and would involve a determination that the Legislature intended that a violation of every section of the Insurance Law should be a misdemeanor under the provisions of section 53 except violations of section 60. Such was not the intention of the Legislature in making the amendment. Section 53 was allowed to remain in its present form unaltered. The incidental change merely eliminated the duplication involved in sections 53 and 60. We are, therefore, of the opinion that under the law

as it now stands a violation of section 60 of the Insurance Law constitutes a misdemeanor.

The proof, however, did not sustain the charge made in the information. To establish the charge it was incumbent upon the People to prove material misrepresentations of the policies made with the intent to induce the holder thereof to change them. The statements relied on by the People to sustain this conviction concerned minor details and incidents connected with the insurance contracts which did not affect or destroy the substantial merit of the suggestion made by the defendants to the insured with respect to his policies.

An expert analyst of insurance policies testified on behalf of the People and set forth some eight respects in which Legg is supposed to have misrepresented the policies which the insured Atwater held. Rightly to understand the nature of the misrepresentations urged, it is necessary to examine the statements which defendants made. The first part of the analysis given to the nsured, Atwater, read as follows:

" PRESENT INSURANCE CONDITION

| Company | Plan | Amount | Premium | (Cash due) Loan Value |
|---|---|---|---|---|
| " Mutual Life........ | 20-Pay Life..... | $25,000 00 | $892 50 | $5,435 00 |
| " Mutual Life........ | 20-Pay Life..... | 25,000 00 | 828 25 | 5,435 00 |
| " Totals......................... | | $50,000 00 | $1,720 75 | $10,870 00* |
| " Less Average Dividends about.................... | | | 570 00 | |
| " Net Premium.............................. | | | $1,150 75 | 6% |
| " Loss of Interest on cash due..................... | | | 652 20 | 652 20 |

" * The Cash Due or Loan Value is the amount you have paid over and above the cost of carrying the insurance to date.

" You receive none of the earnings from this Equity.

" In case of death, this Equity $10,870, is a loss to your estate."

The first and most substantial of these alleged misrepresentations and the only one deserving serious consideration is that in which Legg, speaking of the cash surrender value of the policies in force amounting to $10,870, said: " You receive none of the earnings from this Equity." This statement is interpreted as meaning that the insured literally received no earnings from the equity of his policies, whereas in fact he did receive part of it as a dividend and part as an increase in the cash surrender value of his policy. That the above-quoted statement is not open to this construction is demonstrated by the fact that the statement itself in estimating the net insurance premiums upon the existing policies allows a credit of $570 for dividends. There is, therefore, on the face of this written

statement a self-contradiction of the construction claimed. The obvious intent of the representation was that until the insured had taken the cash surrender value of his policy, none of the income thereof would be available to him for any use outside of his insurance policies. This statement must be read in the light of what Legg had advised the insured, namely, that he could collect the cash surrender value and invest it, and out of its earnings pay a premium on the new straight life policies, so that he would actually have, outside of the protection of his new policies, which in turn would earn dividends, the cash surrender value of his present policies invested at six per cent. Taken as intended, this statement was true.

The second alleged misrepresentation is that " In case of death, this Equity $10,870, is a loss to your estate." This statement is literally true. In case of death the insured would only receive the face of the policy and would receive nothing more. The equity is simply a part of the face amount of the policy which the insured receives from the company at death. The defendants' representation was to the effect that by surrendering the existing policies and taking out new straight life policies, the insured would have insurance for the same amount and at death would receive the face of the policies and have $10,870 in addition thereto, which would not be true if the present policies remained in force.

The third alleged misrepresentation is contained in the phrase, " Less average dividends *about* $570." This had been the dividend for 1930 and it also represented an average covering twenty years' experience as actually computed by the defendant. The use of the word " about " clearly indicates that it was an approximation which the proof shows was substantially correct.

The second part of the statement furnished the insured reads as follows:

" IMPROVED INSURANCE CONDITION

| Plan | Amount | Premium | Cash Received |
|---|---|---|---|
| " Basic Rate Ordy.................... | $50,000 00 | $1,074 50 | $10,870 00 |
| | | | 6% |
| | | | $652 20 |
| " Less interest on cash received...................... | | 652 20 | |
| " Net annual cost.............................. | | $422 30 | |

" *The new insurance provides the following extraordinary features:*
" In case of total disability prior to age 60, *you pay no more premiums.* In case of accidental death, *your beneficiary will receive* $100,000.00. After 3 years the above insurance becomes *participating.* The premium is increased $181.00 and the *dividend* for this year will be $208.50. *The dividend will increase yearly thereafter, reducing your net cost annually as you grow older.")

The fourth alleged misrepresentation is the statement: " Net Annual Cost, $422.30." The claim of falsity as to this is based upon the assertion that the premium for the first year would be greater because certain earnings would not be applied in reduction of the premium until the second year. No one claims that this representation was not true as to all years after the first. The accrued interest on the existing policies, however, would have made up the difference and the statement is substantially true.

The fifth alleged misrepresentation is the sentence: " In case of total disability prior to age 60, you pay no more premiums." This is claimed to be false because suspension of premiums only occurred in case the total disability was *permanent*. That any one would have understood it in any other way seems incredible. The trivial character of this claim fairly indicates the spirit in which the criticism of this statement was undertaken.

The sixth alleged misrepresentation was that " The dividend for this year will be $208.50." This representation is challenged on the ground that there was no guaranty that there would be any dividend of any particular amount nor that the dividend would increase yearly thereafter as stated in the memorandum submitted. This figure was arrived at by applying the Prudential Insurance Company's own schedule of current experience to the age of the insured and the amount of insurance involved. The result represents an absolutely accurate computation on that basis. No one could reasonably construe this statement to be a guaranty as to the future earnings of the company.

The third statement or summary submitted by the defendants reads as follows:

" SUMMARY.

|  | | Net Annual Cost |
|---|---|---|
| " Present Insurance Condition: | | |
| " Insurance | $50,000 00 | |
| " Cash | None | |
| " Total to your estate | $50,000 00 | $1,150 75* |
| " Improved Insurance Condition: | | |
| " Insurance | $50,000 00 | |
| " Cash received | 10,870 00 | |
| " Total to your estate | $60,870 00 | $422 30† " |

" * Double Indemnity & Disability on $25,000 only.
" † Includes Double Indemnity for accidental death.
" Includes waiver of premium for disability prior to age 60."

The seventh alleged misrepresentation is the statement appearing in the summary, " Double Indemnity & Disability on $25,000 only." The accuracy of this statement is not challenged. It is claimed, however, that there was a suppression of the fact that the existing policies paid an income of $2,500 a year for life under the double indemnity and disability clause. Since the statement in which this representation appears was intended to be nothing more than a summary of the policies and since the existence of the disability clause was directly called to the attention of the insured, there was no necessity of including in a " summary " a detailed statement of all the incidents of the double indemnity granted by the policies then in the possession of the insured, the provisions of which were known by him.

The eighth misrepresentation is that the words " Net Annual Cost " at the end of the summary implied that the amounts stated opposite the two insurance companies were payable for the same length of time. That any one could possibly understand that a twenty-payment life policy with only ten more payments due would require the payment of premiums for the same period of time as a straight life policy is inconceivable.

These alleged misrepresentations taken as a whole reflect nothing but a hypercritical examination of these statements undertaken in the hope that in a multitude of trivial criticisms might be found enough substance to support the charge made against these defendants. They are wholly insufficient to support the charge of misrepresentation or to indicate any criminal intent on the part of the defendants.

The judgment should be reversed, the information dismissed and the appellants discharged.

FINCH, P. J., and McAVOY, J., concur; MARTIN and O'MALLEY, JJ., dissent.

MARTIN, J. (dissenting). The information herein charges the defendants with violating the Insurance Law, as follows: " The said defendants, on the 26th day of February, 1930, at The City of New York, in the County of New York, unlawfully did issue and circulate and cause to be issued and circulated an illustration and statement misrepresenting the terms of insurance policies No. 2754536 and No. 2754538 issued by the Mutual Life Insurance Company of New York upon the life of one John J. Atwater and misrepresenting the benefits and advantages promised thereby, and did issue and circulate and cause to be issued and circulated a misleading estimate of the dividends and share of surplus to be

received on said policies and also upon insurance policy No. 6926172 issued by the Prudential Insurance Company of America upon the life of said John J. Atwater and unlawfully did make misleading representations and an incomplete comparison of the above mentioned policies for the purpose of inducing the said John J. Atwater to lapse, forfeit and surrender his said insurance policies in the Mutual Life Insurance Company of New York."

The scheme resorted to in order to obtain ten per cent of the surrender value of existing insurance policies is designated by the district attorney as "twisting." The practice was to induce the insured to cancel valuable insurance policies of long standing upon which there were substantial surrender values, and to procure for him, or assist him in procuring, new policies in other companies. This was accomplished by misrepresenting the accrued and surrender value of the existing policies.

The defendants usually agreed to accept ten per cent of the surrender value of the canceled policies for their services in bringing about this alleged saving to the insured and the agreement between the parties generally closed with an assurance of a substantial refund to the insured, otherwise no charge of any kind was to be made. The rates on the new policies would ordinarily be much larger because of the age of the insured, but this was avoided by inducing the insured to take out straight life policies in other companies so that the premiums would more nearly conform to those paid on the canceled policies which were twenty-payment life or endowment policies with high premiums.

The complaining witness, John J. Atwater, testified that in February, 1930, the defendant Stapler called at his office and advised him that all insurance companies had been overcharging on their policies and that a new law had been passed under which the insured could, upon application to the company, get a refund of all overpayments; that Stapler left with him a card which was apparently a contract to have Legg & Co. send an actuary to audit his insurance, and assuring him a profit of $1,000 and providing for the payment of a fee of ten per cent of the cash received. A short time after Stapler's visit, the defendant Legg made an appointment by telephone and thereafter called at his office where he examined the witness' two Mutual Life Insurance Company policies; made certain notations; advised the witness that he could show him how to effect a saving on insurance costs while receiving the same protection by canceling the existing policies and taking new insurance under a different form and then told the witness that although he usually charged ten per cent of the saving for his services, in this case his fee would be but $250.

Several days after Legg's visit, Anderson called on him at his office, said he was an insurance agent and that he wanted to write him up on a new Prudential three-year straight life contract of insurance; that after asking but one or two questions, Anderson filled out all the answers on an application blank which the witness signed and that Anderson then told the witness to report to a doctor of the Prudential Insurance Company for a medical examination.

Shortly thereafter Legg again called on Mr. Atwater and submitted to him a form letter and requested that it be sent to the Mutual Life Insurance Company; that the letter directed that company to cancel the witness' present insurance; that Legg cautioned him not to send the letter until he received his new policy from the Prudential Insurance Company; that Legg also gave him a written audit of his insurance. Several days later, the witness testified, Anderson, the insurance agent, called at his office and delivered to him a $50,000 policy of insurance issued by the Prudential Life Insurance Company of America.

Joseph B. MacLean, a witness for the People, testified that he was associate actuary of the Mutual Life Insurance Company of New York and that an examination of the policies and the audit submitted by Legg disclosed a number of material misrepresentations which he proceeded to enumerate as follows:

1. That the statement that the policyholder receives "none of the earnings from this Equity" was untrue, in that the insured received all of the interest earnings from the equity of the policies, and received a part of it in cash as a dividend, and part of it as an increase in the cash value of the policies.

2. That the item in the report or audit that "In case of death, this Equity $10,870 is a loss to your estate" was not true. That the equity of a policy is not a loss in the event of death, since it forms a part of the amount of the insurance, and, in fact, was the whole basis of the level premium life insurance under which both the Prudential and the Mutual operate.

3. That the statement "Less average dividends about $570" was a misrepresentation, in that the $570 was merely dividend for the current year, namely, 1930, and not an average dividend either for the past or future, and did not take into account any normal increase in dividends according to the company's current schedule.

4. That the net annual cost as set forth in Exhibit "B" in the center of the page, as $422.30, was a misrepresentation. The net annual cost would depend "on the earning of the year's interest, which would not, of course, be available until one year later, so

that the cost for the first year, the first premium to be paid on the new policy, would not have the benefit of that interest."

5. That the statement made in Exhibit " B," last paragraph, " In case of total disability prior to age 60, you pay no more premiums," was a misrepresentation because the policy itself provides that the disability has to be not only total but permanent as well.

6. That there was a further misrepresentation in the statement that " The dividend for this year will be $208.50," which appears in the same paragraph of Exhibit " B " because no guaranty was given or could be given that " there would be any dividend of any particular amount nor that the dividend would increase yearly thereafter, as the statement goes on to say, nor that there would be any dividend."

7. That the statement under the heading " Present Insurance Condition," to the effect that " Double Indemnity & Disability on $25,000 only " was a misrepresentation. As a matter of fact the Mutual policy contains a *waiver of premiums* such as would have *to be paid* in the Prudential policy, and the Mutual policy in addition, *paid an income of $2,500 a year for life, which was neither mentioned nor referred to in the* statement, and by inference was deliberately suppressed.

8. That the words " Net Annual Cost " on the right-hand side of the summary indicate that the payments are for the same period, when in fact the Mutual Life policy was *payable for ten years more only*, and the Prudential policy would be payable for the entire life of the insured.

Several of the representations made by the defendants to induce the complaining witness to change his policies were of importance. The disability clause alone was shown to be of great advantage to Mr. Atwater, while the policy he was to obtain in the Prudential Life Insurance Company contained no such benefits or advantages. The important differences between the policies are so apparent, as set forth by the associate actuary of the Mutual Life Insurance Company, that it would not seem to require much argument to reach the conclusion that Mr. Atwater was being induced to take out a policy which would be much less advantageous to him than that which he held in the Mutual Life Insurance Company.

The witness MacLean also testified that in his opinion the comparison made between the Mutual Life Insurance Company policies and the Prudential Insurance Company policies by the defendant Legg was incomplete because no mention was made of the fact *that the premiums on the Mutual Life Insurance policies would have to be paid for only ten more years and that the insured would*

*then receive an annual dividend;* that the Mutual Life Insurance Company policies were incontestable whereas the Prudential policies would not be incontestable until after a period of one year; that the Mutual Life policies were payable in case of death by suicide whereas the Prudential policy would not be payable until a period of one year had elapsed; that no mention was made of the difference in the terms and conditions of the policies with respect to the premium payments and cash values and the fact that a normal increase could be expected in the Mutual Life Insurance Company dividends.

The appellant Legg failed to testify as a witness. The appellant Stapler testified that he had been employed for about six years as a representative of the appellant Legg. He admitted that he called upon the complainant Atwater in February, 1930, and after advising him of the saving his firm could effect in Atwater's insurance left with him a proposed contract under which Legg & Co. agreed to audit Atwater's insurance policies for a fee.

On this testimony, which fully established a violation of the provisions of the Insurance Law, the appellants were convicted and the defendant Anderson was acquitted. The appellant Legg was granted a certificate of reasonable doubt, the errors being certified as follows: " The denial of the motion of said defendant that he be acquitted, made on the ground that the evidence adduced against him was insufficient to show a violation of section 60 of the Insurance Law; and the denial of such motion made on the ground that a violation of the acts prohibited by said section 60 of the Insurance Law is not a crime; and the denial of said motion on the ground that the prosecution had failed to make a case."

The appellants contend that a violation of section 60 of the Insurance Law is not a crime, and particularly that there is no such crime when one does not act for one of the corporations or societies therein specified. It is also argued that there was no proof of misrepresentations.

A violation of section 60 of the Insurance Law is a crime. The section provides that the Superintendent of Insurance may also in his discretion revoke the certificate of any corporation, society or agent who violates the provisions of the section.

Section 53 of the Insurance Law provides: "Any corporation or person violating any provisions of this chapter, except where such violation constitutes a felony, shall, *in addition* to any penalty otherwise prescribed for such violation, be guilty of a misdemeanor."

Section 29 of the Penal Law provides: " Where the performance of any act is prohibited by a statute, and no penalty for the violation of such statute is imposed in any statute, the doing such act is a misdemeanor."

Section 60 of the Insurance Law expressly applies to the defendants for it provides as follows:

" § 60. Estimates and misrepresentations prohibited. No life, health or casualty insurance corporation, including corporations operating on the co-operative or assessment plan, mutual insurance companies, and fraternal benefit societies operating on the subordinate lodge system, doing business in this State and no officer, director, representative, or agent therefor or thereof *or any other person*, co-partnership or corporation shall issue or circulate, or cause or permit to be issued or circulated, any illustration, circular or statement of any sort misrepresenting the terms of any policy issued by any such corporation.   *   *   * "

The appellants misrepresentated at least eight distinct phases of the Mutual Life Insurance Company policies. Some of these misrepresentations were not important, others were very important and material. The false representations were made for the express purpose of obtaining a fee by inducing the insured to surrender valuable policies which contained many advantages at the time, having been in force for several years, over ordinary life policies which had no such advantages.

The testimony and exhibits in this record warrant the conclusion that the appellants knowingly violated the Insurance Law by misrepresenting the facts, and the overwhelming evidence disclosed that defendants were endeavoring to defraud Mr. Atwater. The indirect method of approaching the subject indicated that they were not frank in presenting the proposition and that it was being carried out through fraud and deceit.

The attempt of these defendants to avoid each other while carrying out the details of the transaction and their failure to disclose their connection or identity, emphasize the fact that they knew they were attempting to carry out a scheme or transaction which was forbidden by the Insurance Law.

The judgment of conviction should be affirmed.

O'MALLEY, J., concurs.

Judgment reversed, the information dismissed and appellants discharged. Settle order on notice.